**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| HYEWOONG YOON, )<br>    Plaintiff )<br>v. )<br>HYUNWOOK JOO a/k/a )<br>HYUN WOOK JOO a/k/a HYUN W. JOO )<br>a/k/a HYUN-WOOK JOO a/k/a )<br>HARRY JOO a/k/a HARRY H. JOO a/k/a )<br>HARRY HYUN JOO a/k/a )<br>HARRY HYUNWOOK JOO a/k/a )<br>HARRY HYUN-WOOK JOO )<br>    Defendant ) | Civil Action No.: |

## **COMPLAINT**

## **INTRODUCTION**

The Plaintiff seeks an award of damages for Defendant's, conversion, breach of contact, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, fraud, intentional infliction of emotional distress, and defamation.

## **PARTIES**

1. The Plaintiff, Hyewoong Yoon ("Allen"), is an individual residing in Massachusetts.

2. The Defendant, Hyunwook Joo, a/k/a Hyun Wook Joo, a/k/a Hyun W. Joo, a/k/a Hyun-Wook Joo, a/k/a Harry Joo, a/k/a Harry H. Joo, a/k/a Harry Hyun Joo, a/k/a Harry Hyunwook Joo, a/k/a Harry Hyun-wook Joo ("Mr. Joo") is an individual residing at 100 Old Palisade Road, Apt. 3910, Fort Lee, NJ.

## **JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this case pursuant to

4. 28 U.S.C. §1332 as there is a diversity of Citizenship between the Plaintiff and Defendants, and the amount in controversy exceeds $75,000.00.

5. Venue in this District is proper pursuant to 28 U.S.C. § 1391 (b)(1) and (b)(2) as the Defendants reside in this District and a substantial part of the events giving rise to this complaint occurred in this District.

## FACTS

### A. Physical and Emotional Abuse (the "abuse")

6. Allen is a 22 year old college student studying in Massachusetts. Allen was born in South Korea and moved here as a child to go to school while his parents remained in South Korea..

7. Mr. Joo was hired by Allen's parents when Allen was 11 years old, to act as Allen's guardian in the U.S. in exchange for payment. Allen remained in Mr. Joo's custody for approximately 9 years.

8. About a year after Allen began living with Mr. Joo, Mr. Joo married Eunjeong Kim ("Ms. Kim"), who Allen's parents also compensated to act as Allen's guardian.

9. Throughout the course of the nine years that Allen was living under Mr. Joo's care, Mr. Joo had repeatedly bullied Allen, abused him emotionally, neglected to properly care for him, and on several occasions physically abused Allen.

10. The abuse escalated over the years, and had mainly begun after Mr. Joo's marriage to Ms. Kim and after the birth of Mr. Joo's and Ms. Kim's children. Ms. Kim had treated Allen as an unwelcome presence in the home.

11. Mr. Joo, in addition to being hired to care for Allen, was also hired by Allen's father ("Mr. Yoon"), to manage the local branch of a restaurant franchise, BBQ Chicken / bb.q

Chicken (the "company") a large chicken franchise restaurant chain in South Korea with branches all over the world, including in Massachusetts. Mr. Joo's abuse of Allen was particularly severe in the later years when there had been tension between him and Mr. Yoon over monies that Mr. Joo had embezzled from the company.

12. Specific examples of Mr. Joo's abuse include the following:

13. Allen was hospitalized at age 11 for a medical condition. Mr. Joo and Ms. Kim used these conditions to make fun of Allen and didn't stop even after he clearly expressed himself to them that he was uncomfortable with their criticism. Mr. Joo and Ms. Kim, among themselves and to others, would say things about Allen such as: he is unfixable or that he can't control himself or that he is stupid.

14. Mr. Joo would constantly insult Allen about his weight. When Allen was around 14, his father had found a camp for over weight children for Allen to attend. On one occasion, when Allen was around 14 and about to take a shower prior to going to the camp, Mr. Joo tried to take a picture of him naked and said "let's compare this photo to what you look like when you come back…you are too fat, that is why you don't have any friends or a girl friend."

15. Throughout Mr. Yoon's school years, Mr. Joo would call him stupid when he was having any difficulty studying.

16. Mr. Joo often told his children in front of Allen "you should never be like him [referring to Allen]".

17. Prior to taking a TOEFL test when Allen was in 8th grade, Mr. Joo told him that he was too fat and stupid to take the test.

18. When Allen was around 15 and on a two week winter break, Mr. Joo, instead of caring for Allen as he agreed to do, left him at a hotel with a box full of premade rice and raw beef for him to cook and eat during his stay there. Mr. Joo only came to visit him twice at the hotel, but pretended to Mr. Yoon that he was caring for him.

19. When Allen was in 9th grade, one day his left arm started getting bigger than the other side, so he went to the emergency room. He was diagnosed with an infection which began in the ear and passed down to the arm. Allen was then hospitalized for two days. When Mr. Joo came to the hospital he told Allen "I didn't know a pig can get an infection". Mr. Joo also lied to Mr. Yoon that Mr. Joo came to the hospital to see Allen every day.

20. Allen was traumatized by Mr. Joo's acts, and felt sad and helpless and began needing to receive mental health therapy.

21. When Allen was 17, Mr. Joo asked him if he was retarded because Allen had trouble adjusting to his therapy sessions.

22. The physical abuse escalated during this period, which also coincided with the period when Mr. Joo's relationship with Mr. Yoon had been ending due to Mr. Yoon's questioning of how Mr. Joo had been using the company's money. He would frequently knee Allen, punch him in the arm, slap him on the back, or hit his testicles.

23. When Allen was in 11th grade, Mr. Joo and Ms. Kim moved into a new home and Allen came with them. They forbade him from going into the living room, kitchen, or basement, and his use of the home was almost entirely restricted to one room.

24. On one occasion while in the home, Mr. Joo had been with his friend when he called Allen downstairs. Mr. Joo, sarcastically, had asked Allen what his dream was and Allen

showed him on a piece of paper with Allen's art sketch on it. They both laughed at him and Mr. Joo said he was useless and then began speaking negatively about Allen's mother.

25. Towards the end of 11th grade, Mr. Joo, Ms. Kim, their two children, and Allen moved to a new larger home which was paid for by Mr. Yoon. Again, Mr. Joo and Ms. Kim severely restricted Allen's use of the home and where he could go inside. They told him again he had to stay upstairs. They even got him a water fountain upstairs so that he couldn't come down for water.

26. When Allen was 18, he was having pain at school and had been vomiting all day. He told Mr. Joo to inform his nurses of his medical history, but Mr. Joo just told him to shut up and hung up the phone.

27. The next month, in January, during winter break, instead of allowing Allen to stay at the home where Mr. Yoon paid for him to stay, Mr. Joo left Allen at a strange place with only a mattress on the floor and no blankets where the heater was not working properly, and where their was trash lying around and ants crawling all over.

28. Later that year, when Allen had a crush on someone at school, Mr. Joo said "Do you really think someone will love you or like you?

29. The years of Mr. Joo's hurtful comments, neglect, and physical abuse left Allen with great psychological distress, a feeling of low self esteem, and a feeling of being unworthy.

**B. Mr. Joo's Misuse of Allen's funds.**

30. Mr. Joo had throughout the years misused funds that Allen had sent to Mr. Joo or to Allen directly. On many occasions, Mr. Joo would take money from Allen's wallet.

31. From 2013 until June of 2016, Mr. Joo convinced Mr. Yoon to send approximately $641,350.00 for Allen to be privately tutored by an individual that Mr. Joo recommended. Mr. Yoon sent this money to Mr. Joo in addition to money that he sent Mr. Joo as compensation for Mr. Joo's guardianship services. The $614,350.00 was to be held in trust by Mr. Joo for Allen's education. Mr. Joo, however, converted approximately $555,950.00 of that amount for his own use.

32. Mr. Joo had been receiving $142,095.56 per year from Mr. Yoon for Allen's care.

**C. Mr. Joo's False Public Statements About Allen**

33. Ms. Lee is a reporter for the Korean Broadcasting System ("KBS").

34. On or about October 25, 2018, after Mr. Joo contacted her, Ms. Lee came to the United States from South Korea searching for Allen to make a story against Allen and Mr. Yoon. Ms. Lee intended to write a story about how Mr. Yoon used BBQ's money for Allen's education and living expenses in the U.S. The whole story was created by Mr. Joo after having ended his business relationship with Mr. Yoon on poor terms due to Mr. Joo's embezzlement of the company funds.

35. Mr. Joo had told Ms. Lee that Allen's father had been using company money to pay for Allen's education and living expenses. These statements were false, and Mr. Joo had no basis to believe that they were true.

36. Ms. Lee first came to New Jersey looking for Allen.

37. Ms. Lee did not find Allen in New Jersey, but was told by Mr. Joo that he had moved to Massachusetts, and he gave her Allen's address, phone number, and told her where Allen worked.

38. Mr. Joo had also been in possession of Allen's immigration documents that he gave to Ms. Lee.

39. Ms. Lee then went to Massachusetts looking for Allen. She searched for him at the Allston branch of BBQ, which Allen manages, but he was not there when Ms. Lee arrived.

40. Ms. Lee then called Allen while she was in Allston and Allen was in Watertown. Ms. Lee recorded the entire conversation without Allen's knowledge or consent.

41. During the phone conversation, Ms. Lee made statements to Allen such as "we saw that you haven't been going to work". She also asked Allen if he was in Boston, which Allen said he was, and also asked "Why are you in Boston when you received a visa as an employee in New Jersey?"

42. The conversation after being recorded and saved, was then broadcast as part of a video that KBS released on its website, and which was also re published on approximately 50 other websites, including Youtube. KBS has more than a million daily viewers in South Korea and is the number 1 broadcasting station there. A translated copy of the transcription of the video is attached as Exhibit A. The sequential clippings of the video are attached as Exhibit B.

43. The video has remained on the above sites for approximately 3 months.

44. The video, in addition to containing the audio recording of Allen's voice, also contained false statements about Allen and Mr. Yoon which were made by Ms. Lee and by Mr. Joo.

45. The video also contained an embarrassing statement by Mr. Joo about Allen that "His grades wouldn't improve despite his continued education overseas in the U.S. But (the CEO Mr. Yoon) kept saying that his son needed to be accepted to Harvard".

46. The video contained false statements made by Mr. Joo and Ms. Lee including a false statement by Mr. Joo that Mr. Yoon used company money to pay for Allen's and his Allen's sister's education and living expenses in the U.S. Mr. Yoon had in fact used his own personal money to pay for his son's education and living expenses.

47. Within approximately 2 months from when the video was broadcasted, BBQ's revenue dropped by $62,032,975 from its average revenue in the same period prior to the broadcasting of the video. The predicted future loss through 2023 is over one billion eight hundred million ($1,800,000,000.00).

48. Allen has suffered severe financial loss as a result of the video being published and of the phone conversation being recorded without his permission. His loss results both from his being a 63% shareholder of BBQ as well as from lost business opportunities. The video also caused him a great amount of mental distress.

49. Mr. Joo made all these statements about Allen because the business relationship with Mr. Yoon deteriorated after Mr. Yoon learned about Mr. Joo's embezzling of money from the company.

**COUNT I. BREACH OF CONTRACT**

50. Mr. Yoon had a contract with Mr. Joo to provide for the care of his son, Allen, for a period of nine years. Allen was a third party beneficiary of that contract. Mr. Joo breached that contract by failing to provide a minimal level of care for Allen. Instead of caring for him, he constantly bullied him, abused him mentally and physically, and neglected him. Allen was severely damaged as a result, and should receive all or a portion of the money that Mr. Joo received for his care.

**COUNT II. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.**

51. All contracts have an implied covenant of good faith and fair dealing. Mr. Joo breached that contract through the acts described above.

**COUNT III. BREACH OF FIDUCIARY DUTY**

52. Mr. Joo was hired by Mr. Yoon to care for Allen from 2007 until 2016 to care for Allen. Mr. Yoon trusted Mr. Joo to take care for his son's well being. In addition to being paid to care for his son, Mr. Joo was given additional funds which were to be used for Allen. Mr. Joo breached his fiduciary duties to Allen by failing to properly care for him and for improperly spending money intended for his care as described above.

53. Mr. Joo also breached the duty of confidentiality owed to Allen by giving away his address and phone number to a reporter, Ms. Lee, and by giving Ms. Lee confidential information about Allen including immigration documents.

**COUNT IV. FRAUD.**

54. Mr. Joo made false statements to Mr. Yoon that $641,350.00 was needed to pay for Allen's private tutoring. Mr. Yoon relied on these statements to his detriment, and both he and Allen were damaged as a result. Mr. Joo used $555,950.00 of the $641,350.00 for his own purposes.

**COUNT V. CONVERSION**

55. Mr. Joo wrongfully took funds from Allen over the years, including $555,950.00 worth of funds that was intended for Allen's education.

## COUNT VI. DEFAMATION/DEFAMATION PER SE, LIBEL/ LIBEL PER SE, SLANDER/ SLANDER / SLANDER PER SE.

56. Mr. Joo made false statements about Allen to Ms. Lee, knowing that they were false and or recklessly disregarding the truthfulness of those statements. Mr. Joo knew that Ms. Lee was a reporter and that these statements would be widely heard. Allen owns approximately 63% of the company's stock.

57. After a $62,032,975 loss to BBQ, the loss to Allen., who owns approximately 63 percent of the stock, is approximately $39,080,774.25.

## COUNT VII. COMMERCIAL DISPARAGEMENT, INJURIOUS FALSEHOOD, TRADE LIBEL.

58. Mr. Joo made false statements about Allen's commercial character to the press and also falsely imputed that Allen was engaged in receiving company money for his educational and living expenses. These statements were of the sort that would tend to injure a party's trade, occupation, or business. The false statements included, but were not limited to, those described above.

## COUNT VIII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

59. The comments that Mr. Joo made to Allen described above, such as telling Allen when he was in the hospital "I didn't know a pig could get an infection", went beyond all bounds of decency in a civilized society, and caused Allen severe emotional distress as a result.

## CONCLUSION

60. Allen has already incurred a loss of $39,080,774.25. In addition, he is entitled to the return of $1,278,860.00 which Mr. Joo received in the 9 years that he cared for Allen during which he had been severely mistreating and neglecting him, and $555,950.00 for funds that he converted which were intended for Allen's education. In total, the loss to Allen is $40,915,584.25 plus damages for emotional distress.

WHEREFORE, the Plaintiff demands the following relief:

1. Judgment in the amount of $40,915,584.25 with interest, costs, and reasonable attorney's fees plus any additional amounts that the court determines are Allen's future damages.

Respectfully Submitted,

/s/ Joseph Perl_____
Joseph Perl
Attorney for Plaintiff
B.B.O. 680509
203 Arlington St., Suite 2
Watertown, MA 02472
781-704-7047