## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HYEWOONG YOON,               ) <br>       Plaintiff,           ) <br> v.                        ) <br> HYUNWOOK JOO a/k/a       ) <br> HYUN WOOK JOO a/k/a HYUN W. JOO   ) <br> a/k/a HYUN-WOOK JOO a/k/a     ) <br> HARRY JOO a/k/a HARRY H. JOO a/k/a  ) <br> HARRY HYUN JOO a/k/a        ) <br> HARRY HYUNWOOK JOO a/k/a     ) <br> HARRY HYUN-WOOK JOO,       ) <br>       Defendant.          ) | Civil Action No.: 1:19-CV-10351-WGY <br><br> LEAVE TO FILE GRANTED ON 7/9/19 |

## AMENDED COMPLAINT

## INTRODUCTION

The Plaintiff seeks an award of damages for Defendant's conversion, breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, fraud, intentional infliction of emotional distress, and defamation.

## PARTIES

1. The Plaintiff, Hyewoong Yoon ("Allen"), is an individual residing in Watertown, Massachusetts.

2. The Defendant, Hyunwook Joo, a/k/a Hyun Wook Joo, a/k/a Hyun W. Joo, a/k/a Hyun-Wook Joo, a/k/a Harry Joo, a/k/a Harry H. Joo, a/k/a Harry Hyun Joo, a/k/a Harry Hyunwook Joo, a/k/a Harry Hyun-wook Joo ("Mr. Joo") is an individual residing at 100 Old Palisade Road, Apt. 3910, Fort Lee, New Jersey.

## JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332, as there is a diversity of Citizenship between the Plaintiff and Defendant, and the amount in controversy exceeds $75,000.00.

4.  Venue in this District is proper pursuant to 28 U.S.C. § 1391 (b)(1) and (b)(2), as the Plaintiff resides in this District and a substantial part of the events giving rise to this Complaint occurred in this District.

## FACTS

**A.  Physical and Emotional Abuse (the "abuse").**

5.  Allen is a 22 year old college student studying in Massachusetts.  Allen was born in South Korea and moved here as a child to go to school while his parents remained in South Korea.

6.  Mr. Joo was hired by Allen's parents when Allen was 11 years old, to act as Allen's guardian in the U.S. in exchange for payment.  Allen remained in Mr. Joo's custody for approximately 9 years.

7.  About a year after Allen began living with Mr. Joo, Mr. Joo married Eunjeong Kim ("Ms. Kim"), who Allen's parents also compensated to act as Allen's guardian.

8.  Throughout the course of the nine years that Allen lived under Mr. Joo's care, Mr. Joo repeatedly bullied Allen, abused him emotionally, neglected to properly care for him, and on several occasions physically abused Allen.

9.  The abuse escalated over the years, and mainly began after Mr. Joo's marriage to Ms. Kim and after the birth of Mr. Joo's and Ms. Kim's children. Ms. Kim treated Allen as an unwelcome presence in the home.

10. Mr. Joo, in addition to being hired to care for Allen, was also hired by Allen's father ("Mr. Yoon"), to manage the local branch of a restaurant franchise, BBQ Chicken / bb.q Chicken (the "company"), a large chicken franchise restaurant chain in South Korea with branches all over the world, including in Massachusetts.  Mr. Joo's abuse of Allen was particularly severe in the later years when there was tension between him and Mr. Yoon over monies that Mr. Joo had embezzled from the company.

11. Specific examples of Mr. Joo's abuse include the following:

12. Allen was hospitalized at age 11 for a medical condition.  Mr. Joo and Ms. Kim used this condition to make fun of Allen and did not stop even after he clearly expressed to them that he was uncomfortable with their criticism.  Mr. Joo and Ms. Kim, among themselves and to others, would say things about Allen such as:  he is unfixable or that he cannot control himself or that he is stupid.

13. Mr. Joo would constantly insult Allen about his weight.  When Allen was around 14, his father had found a camp for over-weight children for Allen to attend.  On one occasion, when Allen was around 14 and about to take a shower prior to going to the camp, Mr. Joo tried to take a picture of him naked and said "let's compare this photo to what you look like when you come back…you are too fat, that is why you don't have any friends or a girl friend."

14. Throughout Mr. Yoon's school years, Mr. Joo would call him stupid when he was having any difficulty studying.

15. Mr. Joo often told his children in front of Allen "you should never be like him [referring to Allen]".

16. Prior to taking a TOEFL test when Allen was in 8th grade, Mr. Joo told him that he was too fat and stupid to take the test.

17. When Allen was around 15 and on a two-week winter break, Mr. Joo, instead of caring for Allen as he agreed to do, left him at a hotel with a box full of premade rice and raw beef for him to cook and eat during his stay there.  Mr. Joo only came to visit Allen twice at the hotel, but pretended to Mr. Yoon that he was caring for him.

18. When Allen was in 9th grade, one day his left arm started getting bigger than the other side, so he went to the emergency room.  He was diagnosed with an infection which began in the ear and passed down to the arm.  Allen was then hospitalized for two days. When Mr. Joo came to the hospital he told Allen "I didn't know a pig can get an infection."  Mr. Joo also lied to Mr. Yoon that Mr. Joo came to the hospital to see Allen every day.

19. Allen was traumatized by Mr. Joo's acts, and felt sad and helpless and began needing to receive mental health therapy.

20. When Allen was 17, Mr. Joo asked him if he was retarded because Allen had trouble adjusting to his therapy sessions.

21. The physical abuse escalated during this period, which also coincided with the period when Mr. Joo's relationship with Mr. Yoon was ending due to Mr. Yoon's questioning of how Mr. Joo had been using the Company's money.  Mr. Joo would frequently knee Allen, punch him in the arm, slap him on the back, or hit his testicles.

22. When Allen was in 11th grade, Mr. Joo and Ms. Kim moved into a new home and Allen came with them.  They forbade him from going into the living room, kitchen, or basement, and his use of the home was almost entirely restricted to one room.

23. On one occasion while in the home, Mr. Joo had been with his friend when he called Allen downstairs.  Mr. Joo, sarcastically, asked Allen what his dream was and Allen showed him on a piece of paper with Allen's art sketch on it.  They both laughed at him and Mr. Joo said he was useless and then began speaking negatively about Allen's mother.

24. Towards the end of 11th grade, Mr. Joo, Ms. Kim, their two children, and Allen moved to a new larger home which was paid for by Mr. Yoon.  Again, Mr. Joo and Ms. Kim severely restricted Allen's use of the home and where he could go inside.  They told him again he had to stay upstairs.  They even got him a water fountain upstairs so that he could not come down for water.

25. When Allen was 18, he was having pain at school and had been vomiting all day.  He told Mr. Joo to inform his nurses of his medical history, but Mr. Joo just told him to shut up and hung up the phone.

26. The next month, in January, during winter break, instead of allowing Allen to stay at the home where Mr. Yoon paid for him to stay, Mr. Joo left Allen at a strange place with only a mattress on the floor and no blankets where the heater was not working properly, and where there was trash lying around and ants crawling all over.

27. Later that year, when Allen had a crush on someone at school, Mr. Joo said "Do you really think someone will love you or like you?"

28. The years of Mr. Joo's hurtful comments, neglect, and physical abuse left Allen with great psychological distress, a feeling of low self-esteem, and a feeling of being unworthy.

29. Allen was diagnosed with Post Traumatic Stress Disorder (PTSD) in 2018.  The PTSD resulted from the years of physical and psychological abuse that Allen suffered living with Mr. Joo.

**B.  Mr. Joo's Misuse of Allen's funds.**

    **1)  General Misuse of Funds.**

30. During all the times when Mr. Joo received money from Allen or Mr. Yoon as described below, Mr. Joo was Allen's guardian.

31. Mr. Joo had, throughout the years, misused funds that Allen had sent to Mr. Joo or to Allen directly.  On many occasions, Mr. Joo took money from Allen's wallet.

32. From 2013 until June of 2016, Mr. Joo convinced Mr. Yoon to send approximately $641,350.00 for Allen to be privately tutored by individuals and organizations that Mr. Joo recommended.  Mr. Yoon sent this money to Mr. Joo in addition to money that he sent Mr. Joo as compensation for Mr. Joo's guardianship services.  The $614,350.00 was to be held in trust by Mr. Joo for Allen's education.  Mr. Joo, however, converted approximately $536,850.00 of that amount for his own use.

    **2. Misuse of Funds Provided for Tutoring with Boston Tutelage.**

33. In July of 2016, after Allen moved to Cambridge, Mr. Joo came to his home to visit him.  During his visit, he described to him a company called Boston Tutelage.  He told Allen that Boston Tutelage offered private tutoring for college students, and that the tutors were ivy league students and/or graduates who specialized in different subjects.  Mr. Joo said that the class schedule would be flexible, and that he could choose which days of the week and semesters to take classes in.  (See Exhibit A, Affidavit of Allen Yoon.)

34. Allen at first told Mr. Joo that he was not interested.  Mr. Joo then called Mr. Yoon
    multiple times during that period to try and convince him as well.  Eventually, Mr. Joo
    prevailed with his intentions, and Allen shortly thereafter began taking lessons with a
    teacher named Tim Oh ("Mr. Oh") who Mr. Joo referred.

35. From July through October of 2016, Allen paid Mr. Joo $78,000.00 from his account.
    Allen's father funded these lessons.  Allen made payments totaling $78,000.00 to Boston
    Tutelage in 2016 as follows:  $17,000.00 in July, $17,000.00 in August, $22,000.00 in
    September, and $22,000.00 in October.  (See Exhibit B for the wire statements reflecting
    these payments.  The statement of incorporation of Boston Tutelage is also attached as
    Exhibit C.)

36. At the time, Allen did not know what the price was for private tutoring in the Boston area
    or of private tutoring for college students in general.  Mr. Joo told Allen that the
    $78,000.00 was the expense that the tutors charged, and that this would be paid to the
    tutors.

37. Mr. Oh lived with Allen from July through October of 2019 in Cambridge.  Mr. Joo
    dropped Mr. Oh off at Allen's home at the start of their lessons.  Mr. Oh is a graduate of
    Cornell University.  Allen paid for all of Mr. Oh's rent, utilities, and food while he stayed
    with Allen, in addition to the $78,000.00 in tutoring fees.

38. Tutoring payments went directly by wire from Allen's account to Boston Tutelage.

39. In October of 2016, after Allen spoke with Mr. Oh, he learned that in fact the price of his
    lessons was only $6,000.00 per month, not $20,000.00.  Mr. Oh told Allen that Mr. Joo
    had also deceived him regarding these payments, by telling Mr. Oh that a payment of
    $2,000.00 per month would be taken from his pay checks which would go towards Mr.

Joo's efforts at finding Mr. Oh a job in the finance industry for when the tutoring finished.  It turned out that Mr. Joo did little if anything to help Mr. Oh find a job in the finance industry.

40. In around November of 2016 Allen learned that Boston Tutelage was a sham company that did not have a group of teachers specializing in different subjects, and with an organized program that Mr. Joo described.  Rather, Boston Tutelage had one teacher, Mr. Oh, and was set up solely to encourage Allen to pay many times what the actual cost of tutoring was in the Boston area.

41. At the time Mr. Joo was the sole adult in the U.S. that Allen knew of to make big decisions for him like educational decisions, so he followed his advice in signing up for Boston Tutelage.  It was not true that the $78,000.00 he paid represented Mr. Joo's or Boston Tutelage's expenses.  Rather, the great bulk of the $78,000.00 went to Mr. Joo.

42. After Allen stopped making payments to Boston Tutelage, he got a call from Mr. Joo asking why he stopped making the payments.  He told Allen that Boston Tutelage was going to call him about this.  Immediately after Allen hung up the phone, he got a call from a man purporting to be calling from Boston Tutelage, asking why payments were no longer being made.  It is likely that this individual was next to Mr. Joo when he called Allen given the short time lapse between the two calls.

**3. Misuse of Funds Related to Tutoring in New Jersey**

43. In 2018, Mr. Joo, in an attempt to get revenge on Allen's father, Mr. Yoon, for their business disagreements, and out of a grudge that Mr. Joo was no longer receiving income from Mr. Yoon, gave Allen's name and Massachusetts address to a reporter, Seyeon Lee, to make a false news story about Allen as further described below.  After this occurred,

Allen and Mr. Yoon reviewed payment records they had sent to Mr. Joo in the past, and learned that Mr. Joo had been engaging in schemes against Allen in New Jersey similar to the Boston Tutelage scheme.  There, from 2013 until 2016, Mr. Yoon and Allen made payments to Tim Oh (same individual who lived with Allen in Boston), Jeffrey Jeong, and Roots Academy. Allen worked with Mr. Jeong on weekends from 2013-2016, and at Roots Academy during the summers of 2014 and 2015.

44. During this period, in addition to his salary as Allen's guardian, Mr. Joo received $30,000 from Mr. Yoon, which Mr. Joo requested for study books for Allen.

45. From 2013-2016, in addition to Mr. Joo's monthly salary for being Allen's guardian, which was $4,000.00 per month (Mr. Joo also received monthly payments from Yoon Sr. in connection with their work at BBQ), Mr. Joo requested a total of $322,600.00 to pay Mr. Jeong and Roots Academy to tutor him, as well as $219,500.00 to pay for another tutor whose name wasn't disclosed.  These amounts included $21,250.00 for books.  In 2018, Mr. Yoon reached out to all of these teachers who told him that they actually only received $2,000.00 per month from Mr. Joo, and the total that they received was many times less that what Mr. Joo claimed they were paid.  Mr. Joo has not explained where the rest of the money went.

46. The total amount of funds that Mr. Joo kept which he claimed were being paid for tutoring services, including tutoring in Boston and New Jersey, was $536,850.00.

47. A history showing the amounts of all wires for above tutoring payments is attached as Exhibit D.

**4. Funds Paid to Mr. Joo for Allen's Care.**

48. Mr. Joo received $4,000.00 per month from Mr. Yoon for Allen's care during each year he was his guardian.

**C. <u>Mr. Joo's False Public Statements About Allen and Invasion of Privacy</u>.**

49. Ms. Lee is a reporter for the Korean Broadcasting System ("KBS").

50. On or about October 25, 2018, after Mr. Joo contacted her, Ms. Lee came to the United States from South Korea searching for Allen to make a story against Allen and Mr. Yoon. Ms. Lee intended to write a story about how Mr. Yoon used BBQ's money for Allen's education and living expenses in the U.S.  The whole story was created by Mr. Joo after his business relationship with Mr. Yoon ended on poor terms due to Mr. Joo's embezzlement of Company funds.

51. Mr. Joo told Ms. Lee that Allen's father had used Company money to pay for Allen's education and living expenses.  These statements were false, and Mr. Joo had no basis to believe they were true.

52. Ms. Lee first came to New Jersey looking for Allen.

53. Ms. Lee did not find Allen in New Jersey, but was told by Mr. Joo that he had moved to Massachusetts, and he gave her Allen's address, phone number, and told her where Allen worked.

54. Mr. Joo was also in possession of Allen's immigration documents and gave them to Ms. Lee.

55. Ms. Lee then went to Massachusetts looking for Allen.  She searched for him at the Allston branch of BBQ, which Allen manages, but he was not there when Ms. Lee arrived.

56. Ms. Lee then called Allen while she was in Allston and Allen was in Watertown. Ms. Lee recorded the entire conversation without Allen's knowledge or consent.

57. During the phone conversation, Ms. Lee made statements to Allen such as "we saw that you haven't been going to work." She also asked Allen if he was in Boston, which Allen said he was, and also asked "Why are you in Boston when you received a visa as an employee in New Jersey?"

58. The conversation, after being recorded and saved, was then broadcast as part of a video that KBS released on its website, and which was also re-published on approximately 50 other websites, including YouTube. KBS has more than a million daily viewers in South Korea and is the number one broadcasting station there. A translated copy of the transcription of the video is attached as Exhibit E. The sequential clippings of the video are attached as Exhibit F.

59. The video has remained on the above sites for approximately 3 months.

60. The video, in addition to containing the audio recording of Allen's voice, also contained false statements about Allen and Mr. Yoon, which were made by Ms. Lee and by Mr. Joo.

61. The video also contained an embarrassing statement by Mr. Joo about Allen that "His grades wouldn't improve despite his continued education overseas in the U.S. But (the CEO Mr. Yoon) kept saying that his son needed to be accepted to Harvard".

62. The video contained false statements made by Mr. Joo and Ms. Lee including a false statement by Mr. Joo that Mr. Yoon used company money to pay for Allen's and Allen's sister's education and living expenses in the U.S. Mr. Yoon had in fact used his own personal money to pay for his son's education and living expenses.

63. Within approximately two months from when the video was broadcasted, BBQ's revenue dropped by $62,032,975 from its average revenue in the same period prior to the broadcasting of the video.  The predicted future loss through 2023 is over one billion eight hundred million ($1,800,000,000.00).

64. Allen has suffered severe financial loss as a result of the video being published and of the phone conversation being recorded without his permission.  His loss results both from his being a 63% shareholder of BBQ as well as from lost business opportunities.  The video also caused him a great amount of mental distress.

65. Mr. Joo made all these statements about Allen because the business relationship with Mr. Yoon deteriorated after Mr. Yoon learned about Mr. Joo's embezzling of money from the Company.

66. In addition to falsely stating that Allen was receiving embezzled money, Mr. Joo provided Ms. Lee with information contained in Allen's application for a U.S. E2 investment visa.  This application was in Allen's home when Mr. Joo visited him in Boston.

67. A copy of this application appeared in the video broadcasted by KBS.

68. The only way Mr. Joo could have gotten this application is by either taking it from Allen's home or making a copy of it while there.  Allen did not give Mr. Joo permission to do either.

69. An E2 visa is an avenue for individuals to stay in the U.S. legally by making an investment of at least $1,000.000.00 in a U.S. business.  Allen followed this requirement by investing $1,000,000.00 in BBQ in Allston, which employs around 14 people per year

on average since it started.  Allen received an E2 visa by complying with the

requirements.

70. Mr. Joo falsely stated to Ms. Lee that Allen was not complying with the terms of his E2

visa by not working at BBQ.  This statement was false because to be eligible for an E2

visa the individual does not need to actually work at the business, as long they made the

investment in the business.  The statement was also factually false because Allen at the

time did work for BBQ as the manager.

71. After this statement was broadcast, Allen was treated negatively by other members of the

Korean American community in his school.

**D.   Assignment of Rights Against Mr. Joo.**

72. On June 7, 2019, Mr. Yoon assigned to Allen "all claims and causes of action

whatsoever, whether in contact or in tort, or of any other nature, against Hyunwook Joo

("Defendant") which Assigner now has, or ever had from the beginning of the world until

the present."  The assignment includes all claims that were brought or could be brought

against Mr. Joo in this action. (See Exhibit G.)

**COUNT I. BREACH OF CONTRACT TO PROVIDE GUARDIANSHIP SERVICES**

73. Allen repeats and re-alleges the allegations in Paragraphs 1 through 72 as if fully set forth

herein.

74. Mr. Yoon had a contract with Mr. Joo to provide for the care of his son, Allen.  Allen was

a third-party beneficiary of that contract and Mr. Yoon assigned Allen his rights under

that contract.  Mr. Joo breached that contract by failing to provide a minimal level of care

for Allen.  Instead of caring for Allen, he constantly bullied him, abused him mentally

and physically, and neglected him.  Allen was severely damaged as a result, and should receive all or a portion of the money that Mr. Joo received for his care.

## COUNT II. BREACH OF CONTRACT TO PROVIDE TUTORING SERVICES

75. Allen repeats and re-alleges the allegations in Paragraphs 1 through 74 as if fully set forth herein.

76. Allen and Mr. Yoon had an agreement with Mr. Joo to pay Mr. Joo $78,000.00 in exchange for Mr. Joo paying that amount towards Allen's tutoring in Boston.  Mr. Joo also said Boston Tutelage, who would be providing the tutoring, would have a variety of tutors in different subjects.  Mr. Joo breached this agreement by failing to pay the $78,000.00 towards Allen's tutoring, and keeping the bulk of it for himself.

77. Allen and Mr. Yoon had an agreement with Mr. Joo to pay Mr. Joo $78,000.00 in exchange for Mr. Joo paying that amount towards Allen's tutoring in Boston.  Mr. Joo specifically stated that amounts paid for tutoring constituted his expense.  Mr. Joo also said Boston Tutelage, who would be providing the tutoring, would have a variety of tutors in different subjects.  Mr. Joo breached this agreement by failing to pay the $78,000.00 towards Allen's tutoring, and keeping the bulk of it for himself.

78. Allen and Mr. Yoon had an agreement with Mr. Joo to pay Mr. Joo $563,350.00 in exchange for Mr. Joo paying that amount towards Allen's tutoring in New Jersey with Tim Oh, Roots Academy, and another tutor whose name is not known.  Mr. Joo specifically stated that this amount constituted his expense. Mr. Joo breached this agreement by failing to pay this amount towards Allen's tutoring, and keeping the bulk of it for himself.

14

79. Mr. Yoon signed assigned all of his rights to Allen under the above contracts.

## COUNT III. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.

80. Allen repeats and re-alleges the allegations in Paragraphs 1 through 79 as if fully set forth herein.

81. All contracts have an implied covenant of good faith and fair dealing, which required Mr. Joo to refrain from taking any action that would destroy or injure Allen's right to receive the benefits of the agreement.  Mr. Joo breached that implied covenant of good faith and fair dealing through the acts described above.

82. As a direct and proximate result of Mr. Joo's breach of the implied covenant of good faith and fair dealing, Allen suffered substantial damages.

## COUNT IV. BREACH OF FIDUCIARY DUTY

83. Allen repeats and re-alleges the allegations in Paragraphs 1 through 82 as if fully set forth herein.

84. At all relevant times Mr. Joo, as Allen's guardian, was his fiduciary and owed him, as well as Mr. Yoon, a duty of loyalty, a duty to act in his best interests, and a duty to advise him prudently on how to spend his money.

85. Mr. Joo breached his fiduciaries duties to Allen by directing him to spend highly unreasonable amounts to pay for Allen's tutoring with Boston Tutelage.  These amounts were many times higher than what Allen would reasonably have spent on tutoring.

86. For the same reasons that Mr. Joo breached his fiduciary duties to Allen with respect to monies that he advised him to spend on Boston Tutelage tutoring, he also breached his fiduciary duties to Allen in how he advised him to spend money on his tutors in New Jersey, Jeffrey Jeong and Roots Academy.

87. Additionally, Mr. Joo breached the duty of confidentiality owed to Allen by giving away his address and phone number to Ms. Lee.

88. Moreover, Mr. Joo breached the duty of confidentiality owed to Allen by giving Ms. Lee confidential information about Allen including immigration documents.

89. These breaches caused Allen substantial damages as a result.

**COUNT V. FRAUD**

90. Allen repeats and re-alleges the allegations in Paragraphs 1 through 89 as if fully set forth herein.

91. Mr. Joo, with the intent to deceive Allen, induced him to pay $78,000.00 to Boston Tutelage, telling him that was it was a required payment for an expense that the tutor who taught him, Tim Oh, was charging. It was not true that the $78,000.00 was the tutor's fee, and Allen learned that the bulk of the $78,000.00 went to Mr. Joo.

92. Allen reasonably relied on Mr. Joo's intentional representations when he paid $78,000 to Boston Tutelage.

93. As a result of Allen's reasonable reliance he was harmed. This harm includes, but is not limited to, the $78,000 he paid to Boston Tutelage.

94. Mr. Joo, with the intent to deceive Allen, induced him to pay $563,350.00 to Jeffrey Jeong, Roots Academy, and another tutor in New Jersey, telling him that was the amount that they were charging. It was not true that this amount was their fee, and Allen learned that the vast majority of this amount went to Mr. Joo.

95. Mr. Joo made false statements to Mr. Yoon that $641,350.00 was needed to pay for Allen's private tutoring. Mr. Yoon reasonably relied on these statements to his detriment,

and both he and Allen were damaged as a result.  Mr. Joo used $536,850.00 of the

$641,350.00 for his own purposes.

## COUNT VI. VIOLATION OF G.L. CH. 93A

96. Allen repeats and re-alleges the allegations in Paragraphs 1 through 95 as if fully set forth

herein.

97. At all relevant times, Mr. Joo was engaging in trade in Massachusetts with respect to his

operation of Boston Tutelage.  Mr. Joo engaged in deceptive business practices against

Allen by inducing Allen to pay $78,000.00 in expenses which did not exist. Mr. Joo hid

the fact that the majority of this $78,000.00 he kept.

98. Mr. Joo's actions caused Allen to suffer substantial damages as a result.  Of the

$78,000.00 that he paid, only $16,000.00 was paid to Allen's tutor.

99. Allen is entitled to treble damages and attorney's fees based on Mr. Joo's actions.

## COUNT VII. CONVERSION

100. Allen repeats and re-alleges the allegations in Paragraphs 1 through 99 as if fully set forth

herein.

101. Mr. Joo wrongfully took funds from Allen over the years, including $536,850.00 worth

of funds that was intended for Allen's education.  In doing so, Mr. Joo wrongfully

exercised control over Allen's property and interfered with Allen's ownership or

possessory rights.

## COUNT VIII. UNJUST ENRICHMENT

102. Allen repeats and re-alleges the allegations in Paragraphs 1 through 101 as if fully set

forth herein.

103. Mr. Joo received $641,350.00 to be applied as an expense towards Allen's tutoring. Mr. Joo kept the bulk of that amount, $536,850.00, for himself, and Allen has a reasonable expectation of repayment in that amount.

## COUNT IX. DEFAMATION/DEFAMATION PER SE, LIBEL/ LIBEL PER SE, SLANDER/ SLANDER / SLANDER PER SE RELATED TO STATEMENT OF ALLEN'S RECEIPT OF FUNDS AND IMMIGRATION STATUS.

104. Allen repeats and re-alleges the allegations in Paragraphs 1 through 103 as if fully set forth herein.

105. Mr. Joo made false statements about Allen to Ms. Lee that Allen received embezzled money for his education.  Mr. Joo knew that these statements were false and or recklessly disregarded the truthfulness of those statements.  Mr. Joo knew that Ms. Lee was a reporter and that these statements would be widely heard.

106. Allen owns approximately 63% of the Company's stock.  After a $62,032,975 loss to BBQ, the loss to Allen, who owns approximately 63 percent of the stock, is approximately $39,080,774.25.

107. Mr. Joo also falsely stated to Ms. Lee that Allen was violating the terms of his E2 investment visa which caused Allen damage as a result.

## COUNT X. COMMERCIAL DISPARAGEMENT, INJURIOUS FALSEHOOD, TRADE LIBEL RELATED TO ALLEN'S RECEIPT OF FUNDS AND IMMIGRATION STATUS.

108. Allen repeats and re-alleges the allegations in Paragraphs 1 through 107 as if fully set forth herein.

109. Mr. Joo made false statements about Allen's commercial character to the press and also falsely stated that Allen was receiving Company money for his educational and living expenses.  These statements were of the sort that would tend to injure a party's trade,

occupation, or business.  The false statements included, but were not limited to, those described above.

## COUNT XI. INVASION OF PRIVACY

110. Allen repeats and re-alleges the allegations in Paragraphs 1 through 109 as if fully set forth herein.

111. By obtaining Allen's immigration application without Allen's consent, Mr. Joo intentionally intruded on Allen's privacy and upon his private affairs, which was highly offensive to Allen and would be so to a reasonable person.

## COUNT XII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

112. Allen repeats and re-alleges the allegations in Paragraphs 1 through 111 as if fully set forth herein.

113. The physical and emotional abuse described above, such as telling Allen when he was in the hospital "I didn't know a pig could get an infection," and the physical assaults described, went beyond all bounds of decency in a civilized society, and caused Allen severe emotional distress as a result.

### <u>CONCLUSION</u>

114. Allen has already incurred a loss of $39,080,774.25.  In addition, he is entitled to the return of $432,000.00 which Mr. Joo received in the 9 years that he cared for Allen during which he had been severely mistreating and neglecting him, and $536,850.00 for funds that he converted which were intended for Allen's education.  In total, the loss to Allen is $40,049,624.25 plus damages for emotional distress.

WHEREFORE, the Plaintiff demands the following relief:

1. Judgment in the amount of $40,049,624.25 with interest, costs, and reasonable attorney's fees, with treble damages for Count V, any additional amounts that the Court determines are Allen's future damages, plus any relief that the Court deems just and proper.

Respectfully submitted,

*/s/ Joseph Perl*
_____
Joseph Perl, Esquire
ATTORNEY FOR PLAINTIFF
BBO No. 680509
203 Arlington Street, Suite 2
Watertown, MA  02472
(781)704-7047
attorney.perl@gmail.com

*/s/ Bernard D. Posner*
_____
Bernard D. Posner, Esquire
BBO No. 659020
FURMAN GREGORY DEPTULA
4 13th Street, Suite 2
Boston, MA  02129
(617)886-6045
bernard@fgd-law.com

Dated: July 25, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2019 this document was filed through the ECF system and was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and via email or regular mail to non-registered participants.

*/s / Bernard D. Posner*
_____
Bernard D. Posner